# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ROSEMARY KRAJEWSKI, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
|   v. | : | |
| | : | NO. 07-1793 |
| AMERICAN HONDA FINANCE CORP. et al., | : | |
|     Defendants. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                                 May ___, 2008

Plaintiff Rosemary Krajewski filed this action in response to the allegedly wrongful repossession of a car, the purchase of which she and her ex-husband[1] financed through a Retail Installment Contract ("the Contract") with defendant American Honda Finance Corporation ("AHFC"). The car was physically repossessed at the request of AHFC by defendant Richard & Associates, and the repossession was subsequently, and allegedly wrongfully, reported to defendant Trans Union, LLC, a consumer reporting agency, which then documented it on plaintiff's credit report.

Against AHFC, plaintiff alleges in Count I that it violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"); in Count IV that it violated the Pennsylvania Uniform Commercial Code, 13 Pa. Cons. Stat. § 9601 *et seq.* ("UCC"); in Count V that it breached the terms of the Contract and wrongfully repossessed the car; and in Count VI that it converted the

---

[1] Plaintiff's ex-husband, although the registered owner of the car and a signatory to the financing agreement, is not a party to this suit.

car and the personal property therein.  In Count VII, plaintiff also seeks a judgment against AHFC declaring that plaintiff was not in default under the Contract, that AHFC was not entitled to repossess the car, that plaintiff does not owe any deficiency, and that any adverse credit reporting must be corrected.  Against Trans Union, plaintiff alleges in Count II that it violated the FCRA.  Against Richard & Associates, plaintiff alleges in Count III that it violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), and in Count VI that it converted the car and the personal property therein.  Each defendant has moved for summary judgment as to each count against it.  AHFC also counterclaimed against plaintiff for breach of contract, alleging that plaintiff failed to pay the deficiency owed to AHFC after the repossession and sale of the car; AHFC has moved for summary judgment on this claim, as well.

## I.      Factual and Procedural Background[2]

### A.      Repossession of Plaintiff's Car

On May 29, 2004, plaintiff and her ex-husband purchased a new Honda Civic.  (AHFC's Facts ¶ 12; AHFC's Facts Ex. C.)  They financed the purchase through AHFC, and both signed the Contract, which gives AHFC a security interest in the car.  (AHFC's Facts ¶ 14; AHFC's Facts Ex. C.)  In relevant part, the Contract provides that "Buyer will not expose the Vehicle to misuse, seizure, or confiscation, or other involuntary transfer, even if the Vehicle was not the

---

[2] When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, "all justifiable inferences are to be drawn in [the nonmovant's] favor."  *Id.*  Here, plaintiff is the nonmoving party.  Plaintiff and defendants agree on essentially all the facts underlying this dispute.  (*See* Pl.'s Facts ¶¶ 1-62.)  All facts supported by citation to AHFC's statement of facts are undisputed.

subject of judicial or administrative action."  (AHFC's Facts Ex. C.)  "Buyer will be in default
under this Contract if Buyer violates any of the terms and conditions of this Contract including
(but not limited to) Buyer's duty to make payments when due; . . . if Buyer uses the Vehicle or
allows the Vehicle to be used for illegal purposes;[3] or if Buyer defaults in any of Buyer's other
obligations," including the obligation not to "expose the Vehicle to . . . seizure."  (*Id.* (footnote
added).)  "In the event of default, Seller may . . . obtain possession of the Vehicle with or without
process of law."  (*Id.*)  "Buyer authorizes Seller to . . . take possession of the Vehicle after an
event of a default."  (*Id.*)  Upon repossession, "Seller may store personal property found in the
Vehicle at Buyer's expense."  (*Id.*)  The seller must provide to the buyer, upon repossession,
notice of the repossession and notice of the "the earliest date on which Seller may make a private
sale."  (*Id.*)  After sale of the vehicle,

> Seller will apply the proceeds . . . first to the reasonable expenses of sale, then to any
> reimbursable expenses of retaking, repairing and storing the Vehicle, then to late
> charges, then to any other charges permitted by law, and then to the balance due
> under this Contract. . . . To the extent permitted by law, Buyer will be liable for any
> deficiency.

(*Id.*)

Plaintiff and her ex-husband agreed that plaintiff's ex-husband would register the car in
his name and keep it at his home for his daily use.  (AHFC's Facts ¶ 15.)  Plaintiff had her own
car, and plaintiff did not intend to use the new car for her own personal use.  (*Id.* ¶¶ 17-18.)  In
fact, plaintiff drove the car only once.  (R. Krajewski Dep. 22:3-8.)

After purchasing the car, plaintiff and her ex-husband did not discuss who could use the

---

[3] AHFC does not rely on the clause relating to using the car for illegal purposes in support
of its arguments that plaintiff defaulted under the Contract.

car; no limitations or restrictions were agreed to with respect to who could use the car.  (*Id.* at 19:1-7.)  More specifically, plaintiff did not discuss with her ex-husband whether their sons could use the car; plaintiff, however, believed that one of their sons, Joseph, an adult who sometimes lived with his father, occasionally used the car.  (*Id.* at 20:4-17; AHFC's Facts ¶¶ 25-26.)  Plaintiff was aware that Joseph had been charged with driving under the influence in the recent past.  (R. Krajewski Dep. 46:3-6.)

On April 14, 2006, Buckingham Township police arrested Joseph in a school parking lot where he, his girlfriend, and another friend had parked the car.[4]  (AHFC's Facts ¶ 27.)  The police seized the car and the personal property inside the car.  (AHFC's Facts ¶¶ 30, 32; AHFC's Facts Ex. D.)  None of the personal property inside the car belonged to plaintiff, and she had no personal knowledge of the vehicle's contents.  (AHFC's Facts ¶¶ 33-34.)  The car was then transferred to an impoundment lot.  (*Id.* ¶ 35.)

On June 23, 2006, a representative of the Bucks County Detectives sent a letter to AHFC, notifying AHFC that Bucks County had seized the car pursuant to Pennsylvania's Controlled Substance, Drug, Device and Cosmetic Act, 35 Pa. Cons. Stat. § 780-101 *et seq.*  (*Id.* ¶ 38.)  AHFC then submitted internally a request for authorization to repossess the car, and the repossession was authorized.  (*Id.* ¶¶ 41-42.)  The authorization was based on an AHFC representative's belief that seizure represented a default under the Contract, a conclusion that plaintiff contests.  (*Id.* ¶ 42; Pl.'s Facts ¶ 42.)

Richard & Associates removed the car (still containing the personal property that was

---

[4] Joseph was charged with and ultimately pled guilty to drug offenses and receiving stolen property.  (AHFC's Facts Ex. E.)

4

inside it when the car was seized) from the impound lot on behalf of AHFC on or about July 17, 2006.  (AHFC's Facts ¶ 43.)  AHFC then sent to plaintiff and her ex-husband a "Notice of Repossession—Redemption" and a "Notice of Our Plan to Sell Property—Private."  (*Id.* ¶ 45; AHFC's Facts Exs. K, L.)  The repossession notice explained that the car had been repossessed because "[y]ou are in default by reason of your failure to pay the installment(s) due."[5]  (AHFC's Ex. K.)  It further provided that plaintiff had the right to redeem the vehicle by August 5, 2006; the notice of sale explained that, if not redeemed, the car would be sold sometime after August 5, 2006.  (*Id.*; AHFC's Ex. L.)

After the car was repossessed, AHFC reported the repossession to Trans Union, which in turn included on plaintiff's consumer report the remark "RPO," meaning "repossession."  (*See* Laura Henry Dep. 8:11-19, Oct. 30, 2007.)  AHFC never reported to Trans Union that plaintiff had failed to make payments.  (AHFC Facts ¶ 56.)

Meanwhile, at the request of plaintiff's attorney and based on his representation that plaintiff was in the process of securing financing to redeem the car, AHFC agreed to extend the sale date specified in the repossession notice to August 18, 2006.  (AHFC's Facts ¶ 49.)  As part of plaintiff's attempts to secure financing, she requested that a representative of AHFC speak with representatives of the financial institutions from which she sought funding.  (*Id.* ¶ 50.)  AHFC's representative informed these institutions that AHFC repossessed plaintiff's car because of its seizure by the authorities and not for reasons related to any failure by plaintiff to make payments.  (*Id.* ¶ 51.)  Plaintiff asserts, however, that lenders—specifically Household

---

[5] However, as described below, plaintiff had not failed to make payments.  The repossession was based solely on the fact that the car had been seized by the police.

Finance—would not give her a loan to redeem the car because of the repossession entry on her credit report.  (Krajewski Dep. 105:14-106:3.)

Plaintiff was unable to secure financing and failed to redeem the car by August 18, 2006; thus, it was sold at a private sale.  (*Id.* ¶ 52.)  AHFC then notified plaintiff and her ex-husband by letter of the $7,048.80 deficiency remaining after AHFC applied the sale proceeds to the costs incurred in repossessing the car, selling the car, and the balance due under the Contract.  (*Id.* ¶¶ 52-53; AHFC's Facts Ex. M.)  Neither plaintiff nor her ex-husband has made any payments toward this deficiency.  (AHFC's Facts ¶ 53.)

**B.     Plaintiff's Disputes of the Repossession Remark on Her Credit Report**

**1.  October 2006 Notice of Dispute**

On October 10, 2006, Trans Union received a "Request for Investigation" from plaintiff. (TU's Facts ¶ 9.)  On the form, under "[t]he reason I disagree," plaintiff checked "I have never paid late."  (AHFC's Facts Ex. O.)  In the additional comments area of the form, plaintiff wrote: "Never late paying. . . . This is not a real repossession.  Please investigate.  Honda put the adverse on my credit report.  [Household Finance] would have given me a loan to pay Honda off, but it was already put on the credit report as repossession."  (*Id.*)  To the request, plaintiff attached the notice of repossession and notice of sale received from AHFC.  (*Id.*)

In response to plaintiff's request, Trans Union sent AHFC an automated consumer dispute verification form ("ACDV").  (TU's Facts ¶ 12; AHFC's Facts ¶ 57.)  ACDVs are generated by Trans Union when a consumer disputes an entry on a credit report; in response to the dispute, Trans Union reviews all the documentation sent in by the consumer and enters that

information, in industry code, into the ACDV form to be provided to the furnisher.  (Henry Dep. 36:4-13.)  A consumer's notice of dispute is not sent to the furnisher.  (*See* Doreen Wilson Dep. 53:21-54:6, 57:8-58:9, Oct. 30, 2007.)

The ACDV in this case explained, in the "consumer states" field, that plaintiff  "[c]laims company will change.  Verify all account information."  (AHFC's Facts Ex. P.)  The ACDV did not specifically ask AHFC to verify plaintiff's payment history in response to her assertion that she never paid late.[6]

Upon receipt of the ACDV from Trans Union, AHFC personnel compared the information on the ACDV to the information in AHFC's records and, on November 20, 2006, responded that "account information accurate as of date reported."  AHFC requested that only the field reflecting the verification date be updated.  (TU's Facts ¶ 12; AHFC's Facts Ex. P.)

### 2.      January 2007 Notice of Dispute

On January 29, 2007, Trans Union received a letter from plaintiff, in which she again disputed the propriety of the repossession entry on her credit report.  (Trans Union's Facts ¶ 9; AHFC's Facts Ex. Q.)  Plaintiff wrote:  "I request you reinvestigate the American Honda Finance listing . . . again.  There was no default in payments, all the payments were made on time.  The vehicle was improperly repossessed when it was being driven by my son's girlfriend.  There was

---

[6] Laura Henry, a Trans Union representative, testified that, although she had not personally processed plaintiff's notice of dispute, "if I was a representative [of Trans Union] looking at [plaintiff's notice of dispute], the consumer's really not specific, because at first, she's saying it was never paid late, but in our system, it doesn't show she paid late."  (Henry Dep. 49:12-16.)  Because plaintiff was "not specific," Trans Union asked AHFC to "verify all the account information."  (*Id.* at 49:19-21.)

no default and the credit report should not read repossession." (AHFC's Facts Ex. Q.)

In response, Trans Union again sent an ACDV to AHFC. (TU's Facts ¶ 15; AHFC's Facts Ex. R.) This ACDV's "consumer states" field reported that plaintiff disputes her present and previous account status, payment historical profile, payment rating, special comment, and compliance condition codes.[7] It asked AHFC to verify plaintiff's payment historical profile, account status and rating, special comment, and compliance condition codes. (AHFC's Facts Ex. R.) Other codes that do not appear relevant are also listed.

AHFC again responded to the ACDV, on February 21, 2007, that "account information accurate as of date reported." AHFC again requested that only the field reflecting the date the data was verified be updated. (TU's Facts ¶ 15; AHFC's Facts Ex. R.)

### C.    Procedural History

On May 2, 2007, plaintiff filed the instant action against AHFC, Trans Union, and Richard & Associates. Each defendant answered the Complaint, and AHFC asserted a counterclaim against plaintiff. Each defendant has filed a motion for summary judgment as to all claims against it; AHFC additionally asks for summary judgment on its counterclaim.

## II.    Standard of Review

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[7] For explanations of the abbreviations and terms used, see Henry Dep. 51:22-52:10. The special comment refers to the repossession entry on plaintiff's credit report. (Henry Dep. 51:22-52:21.)

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)). The nonmovant must present concrete evidence supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23. The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## III.    Claims Against and Counterclaim by AHFC

Against AHFC, plaintiff brings claims for breach of contract, wrongful repossession, violations of the Pennsylvania UCC, conversion, and violations of the FCRA. AHFC's motion for summary judgment as to these claims will be granted in part and denied in part.

9

### A.      Count V:  Breach of Contract and Wrongful Repossession

Plaintiff asserts that AHFC breached the Contract "by repossessing the vehicle when it had no right or entitlement to do so, by refusing to return the car and by selling the plaintiff's car and demanding a deficiency."  (Compl. ¶ 78.)  AHFC argues in its motion for summary judgment that it had the right to repossess the car pursuant to the Contract because plaintiff violated one of the Contract's provisions, defaulting under the terms of the Contract.  (AHFC's Mem. 3-4.)  Because the relevant provision of the Contract is ambiguous, I will deny AHFC's motion for summary judgment as to this claim.

"A contract is ambiguous if it is capable of more than one reasonable interpretation." *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999).  "If the contract as a whole is susceptible to more than one reading, the factfinder resolves the matter," but "where it is unambiguous and can be interpreted only one way, the court interprets the contract as a matter of law."  *Id.*  Ambiguity is defined as "[i]ntellectual uncertainty; . . . the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980) (quoting *Webster's Third New International Dictionary* (1971)).  To determine whether a contract is ambiguous, the court should "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings."  *Id.*

The Contract provides that "Buyer will be in default under this Contract if Buyer violates any of the terms and conditions of this Contract."  (AHFC's Facts Ex. C.)  The "Buyer's Agreements" provision of the Contract includes the condition that "Buyer will not *expose* the

Vehicle to misuse, seizure, or confiscation, or other involuntary transfer, even if the Vehicle was not the subject of judicial or administrative action." (*Id.* (emphasis added).) There is no question that the car was seized by the Buckingham Township police; the question is whether plaintiff *exposed* the car to the seizure.

At the heart of the question whether plaintiff exposed the car to seizure is the question whether exposure requires some action on the part of the car owner. "Expose" is not defined by the Contract. Turning to its plain meaning, then, to expose is "to submit or subject to an action or influence." *Webster's Third New International Dictionary* 802 (1981). "Submit" is defined, in turn, as "to cause to be subjected," *id.* at 2277, and "subject" is defined as "to cause to undergo or submit to" or to "expose," *id.* at 2275. Causation does not necessarily require positive action. Therefore, the definition of "expose" does not clearly require action on the part of plaintiff; neither does its use in the Contract.

The parties do not dispute that plaintiff and her ex-husband agreed that he would register the car in his name and keep it at his home for his daily use. (AHFC's Facts ¶ 15.) Nor do the parties dispute that, at the time plaintiff signed the Contract, she had her own car, she did not intend to use the car for her own personal use, and she actually used the car only once. (*Id.* ¶¶ 17, 18; Pl.'s Facts ¶ 19.) Further, there is no dispute that plaintiff and her ex-husband never discussed generally who could or could not use the car or whether their son could use the car. (AHFC's Facts ¶ 16.) Taking the facts in the light most favorable to plaintiff, she relinquished control over the vehicle. Whether relinquishment of control of the car is sufficient to expose the car to seizure, however, is not clear from either the Contract's language or the dictionary definition. Thus, it is for the jury to decide whether plaintiff exposed the car to seizure under

11

these facts, as required for default pursuant to the Contract.  AHFC's motion for summary judgment on this issue will be denied.

For the same reason, I will deny AHFC's motion for summary judgment on plaintiff's claim for wrongful repossession in violation of Pennsylvania's Motor Vehicle Sales Finance Act, 69 Pa. Cons. Stat. §§ 601-628 ("MVSFA").[8]  The MVSFA provides that a vehicle may be repossessed "[w]hen the buyer shall be in default in the payment of any amount due under a motor vehicle installment sale contract or when the buyer has committed any other breach of contract, which is by the contract specifically made a ground for retaking the motor vehicle."  *Id.* § 623(A).  There is no dispute that plaintiff was not "in default in the payment of any amount due" under the Contract.  (*See* AHFC's Facts ¶ 56 ("AHFC never reported that Plaintiff had failed to make the monthly payments in a timely fashion prior to the repossession.").)  As explained above, however, there is a dispute as to whether plaintiff breached the Contract by exposing the car to seizure.  Therefore, AHFC's motion for summary judgment on this issue will be denied.

## B.    Count IV:  Violations of the Pennsylvania UCC

Plaintiff alleges that AHFC violated Pennsylvania's UCC "by wrongfully repossessing and then disposing of the vehicle by private sale."  (Compl. ¶ 75.)  Again, AHFC argues that

---

[8] Plaintiff, in her Complaint, does not specifically allege violation of the MVSFA; nevertheless, AHFC argues in its memorandum in support of its motion for summary judgment that AHFC complied with the MVSFA (AHFC's Mem. 4).  Plaintiff's allegations in Count V are sufficient to state a claim for violation of the MVSFA's repossession provision.  *See* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 8.04[3] (explaining that a plaintiff need not "set forth any legal theory justifying the relief sought on the facts alleged").

plaintiff defaulted under the Contract, giving AHFC a statutory right to repossess the car. (AHFC's Mem. 4.)  Because the Contract's term relating to default is ambiguous, I will deny AHFC's motion for summary judgment as to this claim.

Pennsylvania's UCC, 13 Pa. Cons. Stat. §§ 9601-9624, governs the rights of a secured party upon default by a debtor.  Pursuant to 13 Pa. Cons. Stat. § 9609(a)-(b), "[a]fter default, a secured party . . . may take possession of the collateral . . . pursuant to judicial process; or . . . without judicial process if it proceeds without breach of the peace."  Then, "a secured party may sell, lease, license or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing," so long as the disposition is "commercially reasonable."  *Id.* § 9610(a)-(b).  A debtor may recover damages for violations of these provisions.  *See id.* § 9625(b) ("[A] person is liable for damages in the amount of any loss caused by a failure to comply with this division.  Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain or increased costs of alternative financing.").

The Pennsylvania UCC does not, however, define "default."  *See Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F. Supp. 813, 831 (E.D. Pa. 1993) ("Although 'default' triggers the secured creditors' rights under Part 5 of Article 9 of the Uniform Commercial Code, nowhere does Article 9 define the word.").  "Apart from the modest limitations imposed by the unconscionability doctrine and the requirement of good faith, default is whatever the security agreement says it is."  *Id.* (citing J. White & R. Summers, *Uniform Commercial Code*, § 26-2, 1085-86 (2d ed. 1980)).  As explained above, the Contract provides for default when the buyer "violates any of the terms and conditions of this Contract," including the provision of the "Buyer's Agreements" that the buyer "will not expose the Vehicle to misuse, seizure, or

confiscation."  (AHFC's Facts Ex. C.)

Plaintiff asserts in her Complaint that "there was no actionable default entitling [AHFC] to take possession of the vehicle."  (Compl. ¶ 74.)  Plaintiff also asserts that AHFC "violated [§ 9610] by wrongfully repossessing and then disposing of the vehicle by private sale."  (*Id.* ¶ 75.) AHFC asserts, in its memorandum of law in support of its motion for summary judgment, that it complied with its obligations in the repossession and disposition of the car because plaintiff defaulted, that AHFC sent plaintiff the statutorily required repossession notice and notice of sale within the time specified by statute, that plaintiff "cannot point to any evidence that would suggest that AHFC sold the Vehicle in a commercially unreasonable manner," and that AHFC's distribution of the sale proceeds complied with the Contract and Pennsylvania's UCC.  (AHFC's Mem. 4-7.)  Plaintiff replies that she did not default and that the disposition was not commercially reasonable.

As explained above with respect to plaintiff's breach of contract claim, whether plaintiff was in default according to the terms of the Contract is an issue for the jury to resolve.  Whether AHFC had the authority to repossess the car—i.e., whether plaintiff had, in fact, defaulted—logically precedes the issue whether AHFC's disposition of the car was commercially reasonable.  Thus, whether AHFC complied with § 9610, which requires repossession to be commercially reasonable, is not appropriately decided on summary judgment given the jury question with respect to the threshold issue.  AHFC's motion for summary judgment on this claim will be denied.

### C.   Count VI:  Conversion

Plaintiff alleges that "[t]he conduct of [AHFC] . . . constitutes a conversion of plaintiff's vehicle and the contents therein."  (Compl. ¶ 81.)  AHFC argues, however, that the "gist of the action" doctrine bars plaintiff's conversion claim.  (AHFC's Mem. 12-13.)  Because I find this tort claim to be dependent upon and duplicative of plaintiff's breach of contract claim, I will grant AHFC's motion for summary judgment as to this claim.

Under Pennsylvania law, common law conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification."  *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (quoting *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir. 1968)).  The gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims."  *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  It "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims."  *Id.*  "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals."  *Id.* (quoting *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. 1992)).  "To be construed as in tort, . . . the wrong ascribed to defendant must be the gist of the action, the contract being collateral."  *Id.* (quoting *Bash*, 601 A.2d at 829).  The doctrine bars tort claims under the following circumstances:  (1) when they arise "solely from a contract between the parties"; (2) "where the duties allegedly breached were created and grounded in the contract itself"; (3) "where the liability stems from a contract"; or (4) "where the tort claim essentially duplicates a breach of contract claim or the success of which is

wholly dependent on the terms of a contract." *Id.* at 19 (internal quotations and citations omitted).

In the instant case, the repossession—and alleged conversion—occurred "because of [plaintiff's alleged] default under the terms of the . . . Contract entered by [her] on May 29, 2004." (AHFC's Mem. Ex. O, Notice of Repossession—Redemption.)  Thus the alleged conversion AHFC's defense to conversion turns on whether it acted pursuant to the Contract. The parties agree that "[f]or AHFC to have committed conversion, it would have had to repossess the Vehicle in violation of the Contract." (AHFC's Mem. 12; Pl.'s Resp. Opp'n AHFC's Mem. 10.)  Whether AHFC breached the Contract—a question based on whether plaintiff exposed the car to seizure—is a question for the jury.  *See supra* Part III.A.  The success of the conversion claim thus depends on the construction of the Contract's terms.  The conversion claim is barred by the gist of the action doctrine.  *See eToll, Inc.*, 811 A.2d at 19.

Plaintiff's claim alleges conversion not only of the car, but also of the contents therein. (Compl. ¶ 81.)  AHFC notes that plaintiff has admitted that she had no personal knowledge as to what was in the car when it was seized and that none of the items in the vehicle at the time belonged to her.  (R. Krajewski Dep. 36:14-37:9.)  Because plaintiff had neither "actual or constructive possession, or an immediate right to possession of the chattel at the time of the conversion," *see Eisenhauer v. Clock Tower Assocs.*, 582 A.2d 33, 36 (Pa. Super. Ct. 1990), she has no standing to bring a claim for conversion with respect to that property.  Therefore, AHFC's motion for summary judgment will be granted as to this claim.

16

**D.      Count I:  Violations of the FCRA**

Plaintiff asserts that AHFC willfully or negligently violated 15 U.S.C. § 1681s-2(b) by "fail[ing] to fully and properly investigate plaintiff's dispute" upon receipt of the two ACDVs from Trans Union and "fail[ing] to correctly report to each of the credit bureaus" upon discovery of the alleged inaccuracy.  (Compl. ¶ 54.)  In its motion for summary judgment, AHFC argues that Count I should be dismissed because AHFC complied with its obligations under the FCRA.  (AHFC's Mem. 8-9.)  Because the investigation conducted by AHFC in response to the ACDV issued pursuant to the October 2006 notice of dispute was reasonable as a matter of law given the information before AHFC, I will grant AHFC's motion for summary judgment as to this claim.  I will, however, deny AHFC's motion for summary judgment as to plaintiff's claim regarding the investigation conducted by AHFC in response to the ACDV issued pursuant to the January 2007 notice of dispute.

AHFC is a "furnisher[] of information to consumer reporting agencies," and its responsibilities are therefore set out in 15 U.S.C. § 1681s-2.  Pursuant to that section, "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."  *Id.* § 1681s-2(a)(1)(A).  If a consumer contests the accuracy of information furnished to a consumer reporting agency, the consumer may send a notice that the information is disputed to the furnisher of the information, and upon receiving such notice, the furnisher of information must conduct an investigation with respect to the disputed information.  *See id.* § 1681s-2(a)(8) (providing for administrative regulations setting out "the circumstances under which a furnisher shall be required to reinvestigate a dispute concerning the accuracy of information contained in a

consumer report on the consumer, based on a direct request of a consumer"). If information

furnished to a consumer reporting agency is determined to be incomplete or inaccurate, the

furnisher must notify the consumer reporting agency and provide to the agency corrections or

additional necessary information. *Id.* § 1681s-2(a)(2). However, there is no private right of

action based on a furnisher's failure to comply with § 1681s-2(a);[9] enforcement of these

provisions is left to federal agencies. *See id.* § 1681s-2(c), (d); *Perry v. First Nat'l Bank*, 459

F.3d 816, 822 (7th Cir. 2006); *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059

(9th Cir. 2002).

There is, however, a private right of action against a furnisher with respect to § 1681s-

2(b), which provides, in relevant part:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute
> with regard to the completeness or accuracy of any information provided by a person
> to a consumer reporting agency, the person shall—
> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency
> pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report

---

[9] The obligation of the furnisher to report accurately arises from § 1681s-2(a), for which there is no private right of action for violations. In support of its motion, AHFC relies largely on its contention that the information provided to and verified for Trans Union was accurate. Plaintiff, in turn, rests much of her argument on the allegation that, even if technically accurate, the information is sufficiently misleading so as to be inaccurate within the meaning of the statute. This argument over the accuracy of the information is largely irrelevant to plaintiff's claims given the absence of a private right of action with respect to § 1681s-2(a).

Section 1681s-2(b)—the only provision that provides a private right of action against furnishers of information—deals solely with the furnisher's duty to investigate alleged inaccuracies and correct them where they are found by the furnisher to be incorrect. Liability pursuant to this provision occurs as a result of an unreasonable investigation, not simply as a result of inaccurate information being reported. As explained below, AHFC conducted an investigation and concluded that the information was accurate. If its investigation was reasonable, it will not be liable pursuant to § 1681s-2(b).

those results to all other consumer reporting agencies to which the person furnished
the information and that compile and maintain files on consumers on a nationwide
basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or
incomplete or cannot be verified after any reinvestigation under paragraph (1), for
purposes of reporting to a consumer reporting agency only, as appropriate, based on
the results of the reinvestigation promptly—

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

*Id.* § 1681s-2(b)(1).  With respect to the accuracy of information in a credit report, a furnisher of

information has a duty enforceable through a private right of action only after conducting an

investigation in which it finds the disputed information to be inaccurate or incomplete.

A furnisher of information is under no duty to conduct an investigation regarding a

disputed entry on a consumer's credit report pursuant to § 1681s-2(b) until the furnisher receives

notice of the dispute from a consumer reporting agency.  *See* 15 U.S.C. §§ 1681s-2(b)(1),

1681i(a)(2); *see also, e.g.*, *Berkery v. Beneficial Bank*, No. 05-6170, 2006 WL 2273302, at *3

(E.D. Pa. Aug. 7, 2006); *Leet v. Cellco P'ship*, 480 F. Supp. 2d 422, 428 (D. Mass. 2007).  After

being notified of a dispute by a consumer reporting agency, a furnisher must "conduct an

investigation with respect to the disputed information."  15 U.S.C. § 1681s-2(b)(1)(A).  The

investigation must be "a reasonable investigation" of the records of the furnisher, "to determine

whether the disputed information can be verified."  *Johnson v. MBNA Am. Bank, NA*, 357 F.3d

426, 431 (4th Cir. 2004).  While the question whether an investigation is reasonable "is a factual

question normally reserved for trial," "summary judgment is proper if the reasonableness of the

defendant's procedures is beyond question."  *Westra v. Credit Control of Pinellas*, 409 F.3d 825,

827 (7th Cir. 2005); *see also Farren v. RJM Acquisition Funding, LLC*, No. 04-995, 2005 WL

19

1799413, at *7 (E.D. Pa. July 26, 2005) (finding that the defendant furnisher's five-step investigation procedure is, as a matter of law, reasonable).

Absent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records. *See Westra*, 409 F.3d at 827 ("Had Trans Union given Credit Control notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted."); *Farren*, 2005 WL 1799413, at *6 ("The statute does not require . . . any data furnisher to take extraordinary means to investigate and discover disputed information but rather calls for a more passive investigation where the data furnisher is determining only that the information provided to it matches the information in its records."). Whether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable thus depends in large part on the allegations made by the consumer and the notice of the allegations provided to the furnisher by the consumer reporting agency.

Plaintiff made two allegations in her notice of dispute sent to Trans Union:  that she had never paid late, and that the repossession was not "real."  (AHFC's Facts Ex. O.)  As noted previously, AHFC did not receive the notice of dispute, but received only the ACDV prepared by Trans Union.  The repossession remark is clearly present on the ACDVs received by AHFC, but there is no indication on the first ACDV that plaintiff disputed her payment history.  (*See* AHFC's Facts Ex. P.)


### 1.     October 2006 Notice of Dispute

AHFC received from Trans Union only the ACDV generated by Trans Union upon its

receipt of plaintiff's notice of dispute.  The ACDV directed AHFC to "[v]erify all account information."[10]  (AHFC's Facts Ex. P.)  It did not request any information specifically with reference to plaintiff's claim that she "never paid late" or her claim that this was not a "real repossession."  (*See* AHFC's Facts Exs. O, P.)  Like the notice received by the defendant-furnisher in *Farren*, this notice does not suggest allegations of fraud or identity theft, *see* 2005 WL 1799413, at *6, nor does it suggest any other reason that would require AHFC to "go beyond a verification of the relevant information provided."  *See id.* (citing *Westra*, 409 F.3d at 827).  AHFC's "personnel reviewed the . . . ACDV, compared the . . . ACDV to its records relating to [p]laintiff's [a]ccount, verified the accuracy of its reporting[,] and provided its results to Trans Union."  (AHFC's Facts ¶ 58.)  Upon investigation in response to the instructions on the ACDV, AHFC concluded that all the information reported by Trans Union was "accurate as of date reported" (AHFC's Ex. P), thus fulfilling its obligation under the FCRA.

### 2.        January 2007 Notice of Dispute

In her January 2007 notice to Trans Union, plaintiff stated:  "There was no default in payments, all the payments were made on time.  The vehicle was improperly repossessed . . . .  There was no default and the credit report should not read repossession."  (AHFC's Facts Ex. Q.)  The ACDV sent by Trans Union to AHFC directed AHFC to "Verify Pymt Hist Profile, Acct

---

[10] AHFC did not receive copies of the letters plaintiff sent to Trans Union (i.e., the October 2006 and the January 2007 notices of dispute sent by plaintiff to Trans Union).  AHFC received only the ACDVs prepared by Trans Union.  (*See* Wilson Dep. 53:21-54:6, 57:8-58:9.)

Status and Rati[ng] . . . Verify Spec Comment, Compliance Cond Code."[11]  (AHFC's Facts Ex.

R.)  AHFC's investigation in response to this notice was the same as it had been in response to

the October 2006 notice.  That is, AHFC's "personnel reviewed the . . . ACDV, compared the . . .

ACDV to its records relating to [p]laintiff's [a]ccount, verified the accuracy of its reporting[,]

and provided its results to Trans Union."  (AHFC's Facts ¶ 62.)  AHFC reported that "account

information accurate as of date reported."  (AHFC's Facts Ex. R.)

The ACDV prepared by Trans Union upon receipt of plaintiff's January 2007 notice of

dispute contained more detail regarding the information AHFC was asked to verify than did the

ACDV prepared by Trans Union in response to plaintiff's October 2006 notice of dispute.  In the

second ACDV, AHFC was specifically asked to verify plaintiff's payment historical profile.[12]

(*Id.*; Henry Dep. 51:24-52:1.)  There is no evidence in the record, however, of any investigation

AHFC conducted in response to the second, more detailed ACDV beyond that conducted in

response to the first ACDV, which did not highlight plaintiff's payments dispute or the alleged

impropriety of the repossession.  The evidence suggests that AHFC discounted this dispute

---

[11] This request essentially asks AHFC to verify the basic account and payment information.  The "Verify Spec Comment" entry "ties into the remark field of the dispute," which is "where the repossession is shown."  (Henry Dep. 51:22-52:21.)

[12] With respect to plaintiff's claim that she had always made timely payments, AHFC's representative testified that "there was no question" that there had not been late payments on plaintiff's account.  Moreover, she testified that at the time of the dispute, plaintiff's credit report did not reflect late payments.  (Wilson Dep. 56:12-57:6.)

As noted previously, AHFC did not receive a copy of plaintiff's January 2007 notice of dispute, in which she specifically asserted that she had always made timely payments.  Even if AHFC had been presented with plaintiff's notice of dispute, it would have reached the same conclusion.  (*See* Wilson Dep. 57:19-58:9 ("Q. . . . [I]s there anything contained in [the January 2007 notice of dispute] that would have caused Honda to—had they seen every word of that document when they responded to the ACDV, would have caused them to respond in any way other than verified as reported?  A.  No.").)

because it believed that plaintiff's credit report did not reflect late payments and that "there was

no question" that there had not been late payments on plaintiff's account.  (Wilson Dep. 56:12-

57:6.)  Given the plain meaning of the term repossession—which, as explained below, *see infra*

Part IV.A, implies non-payment—this dismissal of plaintiff's claim by AHFC may not have been

reasonable.  Thus, with respect to this notice of dispute, it is for the jury to determine whether

AHFC's investigation and response to Trans Union was consistent with the requirements of 15

U.S.C. § 1681s-2(b)(1).


###    E.    Count VII:  Declaratory Relief

Plaintiff requests a declaratory judgment against AHFC that (1) "plaintiff was not in

default" under the Contract, (2) AHFC "was not lawfully entitled to repossess plaintiff's car," (3)

"plaintiff does not owe any deficiency," and (4) "[a]ny adverse credit reporting must be

corrected."  (Compl. ¶ 87.)   AHFC argues that these requests should be dismissed because they

are duplicative of her breach of contract and FCRA claims and because plaintiff cannot adduce

evidence demonstrating either breach of contract or violation of the FCRA by AHFC.  I will deny

AHFC's motion as to plaintiff's request for declaratory relief.

The Declaratory Judgment Act, 28 U.S.C. § 2201, empowers federal courts to grant

declaratory relief.  The Third Circuit has emphasized that the exercise of this declaratory relief

power is discretionary.  *See, e.g.*, *State Auto Ins. Co. v. Summy*, 234 F.3d 131, 133 (3d Cir. 2000)

(finding that § 2201 "contemplates that district courts will exercise discretion in determining

whether to entertain such actions"); *see also* 12 James Wm. Moore *et al.*, *Moore's Federal*

*Practice* § 57.40 (3d ed. 2007).  A district court may decline to exercise its discretion to hear

claims for declaratory relief when the claims are duplicative of other claims. *See State Auto Ins. Co.*, 234 F.3d at 135 (reasoning, in the context of parallel state and federal actions, that "[a] federal court should also decline to exercise its discretionary jurisdiction when doing so would promote judicial economy by avoiding duplicative and piecemeal litigation").

In the instant case, there is no parallel state action implicating the federalism concerns that often accompany requests for declaratory relief. Furthermore, allowing plaintiff to proceed with her requests for declaratory relief will not hinder judicial economy. Whether each of plaintiff's first three requests for declaratory relief should be granted hinges entirely on the outcome of plaintiff's claims and AHFC's counterclaim for breach of contract. Declaratory relief with respect to plaintiff's fourth request, if plaintiff prevailed, would create a remedy distinct from the damages remedy which plaintiff is also pursuing. Therefore, although these requests are largely duplicative of plaintiff's other claims, there is no good reason for this court to decline to exercise its jurisdiction. *See United States v. Pa., Dep't of Envtl. Res.*, 923 F.2d 1071, 1073 (3d Cir. 1991) (holding that § 2201 should "have a liberal interpretation").

With respect to the underlying merits of the requests for declaratory judgment, AHFC's motion for summary judgment will be denied as to the first three requests for declaratory relief for the reasons explained above with respect to plaintiff's breach of contract and related claims. "[I]f a jury trial is permitted on the underlying claim, the declaratory judgment action may also be conducted before a jury." Moore, *supra*, at § 57.64. Thus, the issues of contract interpretation and disputed material fact that prevent plaintiff's breach of contract and related claims from being decided as a matter of law similarly prevent the issue of the legality of the repossession from being decided by the court in the context of plaintiff's request for declaratory relief. As to

24

the breach of contract claims and declaratory judgment requests one through three, there is a material dispute as to whether plaintiff breached the Contract by exposing the car to seizure. *See supra* Part III.A. Therefore, AHFC's motion for summary judgment as to plaintiff's first three requests for declaratory relief will be denied.

AHFC's motion for summary judgment as to plaintiff's fourth request for declaratory relief (that any adverse reporting by AHFC be corrected) likewise will be denied. After an investigation by a furnisher of information at the behest of a consumer reporting agency, in which the furnisher finds that the information to be verified is incomplete or inaccurate, the furnisher has a duty, enforceable through a private right of action, to modify the information to assure the accuracy and completeness of the information reported to a credit reporting agency. *See* 15 U.S.C. § 1681s-2(b)(1). Because I have denied AHFC's motion for summary judgment with respect to its conformity with the requirements of the FCRA in its investigation in response to the second ACDV from Trans Union, *see supra* Part III.D.2, I will deny AHFC's motion for summary judgment as to plaintiff's fourth request for declaratory relief.

### F.     AHFC's Counterclaim for Breach of Contract

AHFC counterclaimed against plaintiff for the amount of the deficiency owed after the sale of the car and moved for summary judgment as to its counterclaim. (AHFC's Answer ¶¶ 101-122; AHFC's Mem. 14-15.) AHFC alleges that the Contract obligated plaintiff to pay any deficiency remaining after the sale and that, after having received notice of a deficiency, plaintiff has not paid the deficiency. (*Id.* ¶¶ 110, 121, 122.) As above with respect to plaintiff's breach of contract claim, I will deny AHFC's motion for summary judgment as to its counterclaim because

the relevant provision of the Contract is ambiguous.

The Contract provides as follows with respect to disposition of the car upon repossession and liability for any deficiency:

> Seller will send Buyer reasonable notice of the time and place of any public sale or of the earliest date on which Seller may make a private sale.  Seller will apply the proceeds of any sale or other disposition first to the reasonable expenses of sale, then to any reimbursable expenses of retaking, repairing and storing the Vehicle, then to late charges, then to any other charges permitted by law, and then to the balance due under this Contract. . . . To the extent permitted by law, Buyer will be liable for any deficiency.

(AHFC's Mem. Ex. C.)  It is undisputed that neither plaintiff nor her ex-husband has made any payments toward the deficiency amount.  (AHFC's Facts ¶ 53.)

Plaintiff only owes the deficiency, however, if the car was repossessed in accordance with the terms of the Contract.  As explained above with respect to plaintiff's breach of contract claim against AHFC, whether AHFC repossessed the car pursuant to the terms of the Contract depends on the meaning of the ambiguous term "expose" as used in the Contract.  Because that question is for the jury, summary judgment on this counterclaim is inappropriate.  Therefore, AHFC's motion for summary judgment on its counterclaim will be denied.

IV.   **Claim Against Trans Union:  Count II:  Violations of the FCRA**

Plaintiff asserts that Trans Union violated the FCRA by (1) "willfully and/or negligently failing, in the preparation of the consumer reports concerning plaintiff, to follow reasonable procedures to assure maximum accuracy of the information in the reports" in violation of 15

U.S.C. § 1681e(b),[13] and (2) "by willfully and/or negligently failing to reinvestigate pursuant to

15 U.S.C. § 1681i."[14]  (Compl. ¶ 66.)  I will deny Trans Union's motion for summary judgment.[15]

### A.    Failure to Follow Reasonable Procedures in Violation of 15 U.S.C. § 1681e(b)

To prevail on a claim of negligent failure to comply with § 1681e(b), a plaintiff must

show the following four elements:  (1) that "inaccurate information was included in a consumer's

credit report," (2) that "the inaccuracy was due to defendant's failure to follow reasonable

---

[13] Section 1681e(b) provides:  "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

[14] Section 1681i(a)(1)(A) provides:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

Then, in accordance with subsection (a)(2)(A):

> Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute . . . in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

[15] Liability for negligent violations of the FCRA is created by 15 U.S.C. § 1681o. Liability for willful violations is created by 15 U.S.C. § 1681n, which also provides for punitive damages upon a finding of willful noncompliance.  As for plaintiff's punitive damages claim against Trans Union, see Part IV.C, *infra*.

procedures to assure maximum possible accuracy," (3) that "the consumer suffered injury," and (4) that "the consumer's injury was caused by the inclusion of the inaccurate entry."  *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996).  Trans Union argues that it is entitled to summary judgment because the information was accurate, meaning that plaintiff cannot show the first element.  (TU's Mem. 5.)

A plaintiff cannot sustain a claim to enforce § 1681e(b) without showing an inaccuracy in her credit report.  Whether the accuracy requirement of § 1681e(b) merely requires technical accuracy or requires something more has not been clarified by either the United States Supreme Court or the Third Circuit.  Plaintiff urges this court to follow the D.C. Circuit's reasoning in *Koropoulos v. The Credit Bureau, Inc.*, 734 F.2d 37 (D.C. Cir. 1984), which rejected the technical accuracy defense in the context of a consumer reporting agency defendant.  The court denied summary judgment for the consumer reporting agency where "there is a genuine issue of fact as to whether the report was sufficiently misleading so as to raise the issue of whether [the defendant's] procedures for assuring 'maximum possible accuracy' were reasonable."  *Id.* at 42.

In rejecting the technical accuracy defense as applied to consumer reporting agencies, the D.C. Circuit based its conclusion on the FCRA's requirement that consumer reporting agencies employ reasonable procedures to assure more than mere accuracy.  *Id.* at 40.  The FCRA provides:  "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b) (emphasis added).  District courts in the Eastern District of Pennsylvania have applied *Koropoulos*.  *See Agosta v. InoVision*, No. 02-806, 2003 WL 22999213, at * (E.D. Pa. Dec. 16, 2003) ("Though 'technically accurate,'a

28

derogatory entry on a credit report is actionable because it is misleading or materially incomplete."); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, No. 02-1188, 2003 WL 22844198, at *4 (E.D. Pa. Nov. 25, 2003) ("Because the Third Circuit has not endorsed the 'technical accuracy defense,' we shall apply the less stringent approach articulated in *Koropoulos*." (internal footnote omitted)).  *But see Todd v. Associated Credit Bureau Servs., Inc.*, 451 F. Supp. 447, 449 (E.D. Pa. 1977) (holding, prior to *Koropoulos*, that a technically accurate consumer report precluded a finding of liability of the consumer reporting agency).  I, too, will follow *Koropoulos* and deny summary judgment if "there is a genuine issue of material fact as to whether the report was . . . misleading."  734 F.2d at 42.

Whether the credit report in the instant case is accurate and not misleading depends on the meaning of "repossession" as used in the report.  "Repossession" is not defined by federal or Pennsylvania statute.  It is defined by the dictionary as "the act of resuming possession of property *when the purchaser fails to keep up payments on it*."  *Webster's Third New International Dictionary* 1926 (1981) (emphasis added).  Similarly, one dictionary definition of the verb "repossess" is "to resume possession of (an item purchased on installment) *in default of the payment of installments due*."  *Id.* (emphasis added).  Given these definitions, and applying the *Koropoulos* approach, a reasonable jury could conclude that Trans Union's reporting was so misleading as to be inaccurate.  Therefore, I will not grant Trans Union's motion for summary judgment on the basis of the alleged accuracy of the report.[16]

---

[16] Neither plaintiff nor Trans Union has addressed the question whether the alleged inaccuracy in plaintiff's credit report was due to Trans Union's negligent failure to follow reasonable procedures.  "[C]onsumer reporting agencies are liable only when inaccuracies are the result of their failure to follow reasonable procedures."  *Philbin*, 101 F.3d at 964.  The Third Circuit has not decided what a plaintiff must prove on the issue of reasonableness to prevail on a

Trans Union asserts in the alternative that "Trans Union is entitled to summary judgment on [p]laintiff's claims of damages relating to credit denials in August 2006 because these allegedly occurred prior to her disputes." (TU's Mem. 5.)  Trans Union also asserts that "there is no evidence that an *actual* recipient of [p]laintiff's consumer report was misled or would have acted on [p]laintiff's application for credit differently if the reason why the repossession occurred had been included in [p]laintiff's report." (TU's Reply 2.)

Plaintiff argues that, in the context of damages, Trans Union erroneously conflates § 1681i(a)'s reinvestigation requirement with § 1681e(b)'s reasonable procedures requirement.  I agree.  Section 1681 relates to "reasonable procedures to assure maximum possible accuracy" in reporting generally, 15 U.S.C. § 1681e(b), and so the time at which a consumer disputes the information is irrelevant to the § 1681e(b) analysis.

With respect to causation, a plaintiff need not "satisfy his burden only by introducing direct evidence that consideration of the inaccurate entry was crucial to the decision to deny credit."  *Philbin*, 101 F.3d at 968.  Instead, a plaintiff need only "produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a 'substantial factor' that brought about the denial of credit."  *Id.*  Plaintiff asserts, based on her conversation with a Household

---

claim brought for an alleged violation of § 1681e(b), but it has enunciated three possibilities:  (1) "a plaintiff must produce some evidence beyond a mere inaccuracy in order to demonstrate the failure to follow reasonable procedures," *id.* at 965 (relying on *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C. Cir. 1984)); (2) "the jury may infer the failure to follow reasonable procedures from the mere fact of an inaccuracy," *id.* (relying on *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991)); or "upon demonstrating an inaccuracy, the burden shifts to the defendant to prove that reasonable procedures were followed," *id.* (relying on *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995)).  Given the unclear state of the law in this circuit and the parties' failure to address the issue, I will not decide whether Trans Union's procedures as described in the record before me were reasonable.

Finance representative, that Household Finance would have given her a loan to redeem the car had the repossession not been reported in the way that it was.  In her deposition, plaintiff testified as follows:[17]

> He would have given me a loan.  It doesn't matter if you pay 25 percent.  They give you a loan for anything.
> He said to me—he made it clear to me that I would have given you the loan had it not been reported that way on your credit report.  But the way it is reported on your credit report, I cannot give you a loan
> Q.      And did he say how it was reported on your credit report?
> A.      Those are the words he used to me, the way it was reported on your credit report, I cannot give you the loan.

(Krajewski Dep. 105:14-106:3.)  Assuming the truth of these statements—as I must when evaluating Trans Union's motion for summary judgment—I find sufficient evidence of a denial of credit resulting from the repossession entry on plaintiff's credit report for plaintiff to survive Trans Union's motion for summary judgment.  Therefore, I will deny Trans Union's motion for summary judgment as to plaintiff's claim alleging violation of § 1681e(b).

## B.      Failure to Reinvestigate in Violation of 15 U.S.C. § 1681i

Pursuant to 15 U.S.C. § 1681i(a)(1)(A), "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall . . . conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate."

A claim under § 1681i(a), like a claim under § 1681e(b), requires the consumer to show

---

[17] Hearsay in a plaintiff's deposition testimony may be sufficient evidence to survive a defendant's motion for summary judgment when plaintiff can produce the declarant to testify at trial and the declarant's testimony would be admissible at trial.  *See Clark v. Pennsylvania*, 885 F. Supp. 694, 709 n.3 (E.D. Pa. 1995) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1235 n.9 (3d Cir.1993)).

that the report was inaccurate.  *See, e.g.*, *Klotz v. Trans Union LLC*, 246 F.R.D. 208, 213 (E.D.

Pa. 2007) (citing *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226-27 (3d Cir. 1997)).  As

explained above, a reasonable jury could conclude that Trans Union's reporting was so

misleading as to be inaccurate.

        To prevail under § 1681i(a), the consumer must also show that a reasonable

reinvestigation would have uncovered the inaccuracy.  *Id.* at 212 (citing *Cushman*, 115 F.3d at

226.)  In fulfilling its obligation to conduct a reasonable reinvestigation, "a credit reporting

agency may be required, in certain circumstances, to verify the accuracy of its initial source of

information."  *Cushman*, 115 F.3d at 225 (quoting *Henson v. CSC Credit Servs.*, 29 F.3d 280,

287 (7th Cir. 1994)).  As part of its reinvestigation, the consumer reporting agency has a duty to

verify the accuracy of the initial source when the "consumer has alerted the reporting agency to

the possibility that the source may be unreliable or the reporting agency itself knows or should

know that the source is unreliable" and "the possible harm inaccurately reported information may

cause the consumer" outweighs "the cost of verifying the accuracy of the source."  *Id.* at 225-26

(quoting *Henson*, 29 F.3d at 287).  Generally, "it is for the trier of fact to weigh these factors in

deciding whether the defendant violated the provisions of section 1681i."  *Id.* (internal quotations

and alterations omitted).

        In this case, I find as a matter of law that Trans Union did not have a duty to verify the

accuracy of the information provided by AHFC with respect to the fact of the car's repossession.

Plaintiff disputed whether AHFC's repossession of the car was in accordance with the terms of

the Contract.  There was no question that the car was, in fact, repossessed, meaning that to verify

the information and address plaintiff's concerns, Trans Union would have had to interpret the

Contract.  This would require the same lengthy and costly analysis that the court is now

performing.  In terms of the balancing test set out by the *Cushman* court, the cost to Trans Union

associated with such an analysis is sufficiently high such that Trans Union had no duty to

conduct that legal analysis.  Furthermore, the role of a consumer reporting agency is not to decide

legal disputes, such as whether a transaction conforms to the terms of a contract.  In this case, in

which there is no indication that Trans Union knew or should have known that AHFC was

unreliable, Trans Union had no duty to verify the accuracy of the initial source of the

information.  Any reinvestigation short of an interpretation of the Contract in plaintiff's

favor—which I have decided was not required—would not have uncovered the alleged

inaccuracy with respect to the reported repossession.

Plaintiff also, however, asserted in both the October 2006 and January 2007 notices of

dispute that she had never made late payments.  (*See* AHFC's Facts Exs. O, Q.)  But the ACDV

transmitted by Trans Union to AHFC in response to plaintiff's October 2006 notice of dispute

made no mention of plaintiff's dispute regarding payments; it asked AHFC to simply "[v]erify all

account information."  (AHFC's Facts Ex. P.)  As explained above, the plain meaning of the

repossession entry on plaintiff's credit report could imply that plaintiff failed to make timely

payments.  *See supra* Part IV.A.  Thus, a reasonable jury could find that Trans Union's failure to

transmit this dispute prevented Trans Union from conducting a "reasonable reinvestigation to

determine whether [plaintiff's credit report] is accurate," 15 U.S.C. § 1681i(a)(1)(A).

The ACDV transmitted by Trans Union to AHFC in response to plaintiff's January 2007

notice of dispute did ask AHFC to verify plaintiff's payment historical profile.  (AHFC's Facts

Ex. R.)  There is insufficient evidence in the record, however, of the meaning of these entries as

they relate to the question whether plaintiff's credit report inaccurately states that she failed to make timely payments.[18]  Thus I cannot conclude from the face of this ACDV that Trans Union conducted a reasonable reinvestigation with respect to plaintiff's January 2007 notice of dispute.

Because of the current paucity of evidence in the record regarding the investigation conducted by Trans Union and because, depending on additional evidence regarding Trans Union's reinvestigation, a reasonable jury might find that Trans Union acted unreasonably in failing to transmit plaintiff's dispute regarding her history of timely payments to AHFC, I will deny Trans Union's motion for summary judgment with respect to the payments issue.

### C.    Punitive Damages

Plaintiff has asked that Trans Union pay punitive damages for its alleged violations of the FCRA, a remedy the FCRA provides for when a credit reporting agency has acted willfully in failing to comply with the FCRA, *see* 15 U.S.C. § 1681n.  Trans Union argues, however, that its "belief that its procedures [whereby it relied solely on information furnished by AHFC in reporting credit information] did comply with the FCRA is not objectively unreasonable, and Trans Union is entitled to summary judgment on [p]laintiff's willfulness claims."  (TU's Mem. 6.)  Plaintiff did not respond to this argument, and, seeing no evidence that Trans Union acted willfully, I will grant Trans Union's motion for summary judgment as to plaintiff's claims based on alleged willful noncompliance with the FCRA.

---

[18] Trans Union's representative testified that "disputes present/previous account status, payment historical profile, payment rating, verify payment historical profile, account status and rating . . . is all tied into the manner of payment."  (Henry Dep. 51:22-52:3.)  The whole line is one industry code.  (*Id.* at 52:4-5.)

"[W]illful noncompliance" with the FCRA, as used in § 1681n, encompasses actions taken in reckless disregard of the FCRA's obligations. *Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201, 2208-10 (2007). "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 2215. The assessment is objective. *Id.* Where the reading has "a foundation in the statutory text . . . and a sufficiently convincing justification," it is not an objectively unreasonable interpretation of the FCRA, even if the court reviewing the company's reading of the statute disagrees with it. *Id.* at 2216. A reading of the FCRA will be unreasonable, however, when "the business subject to the [FCRA] had the benefit of guidance from the courts of appeals or the Federal Trade Commission . . . that might have warned it away from the view it took." *Id.*

Both decisions of federal appellate courts and FTC guidance support the conclusion that Trans Union's interpretation of the FCRA's requirements were not objectively unreasonable. As explained above, the Third Circuit has concluded that in many cases not involving alleged fraud or identity theft a consumer reporting agency may rely on information provided by a furnisher of information without further investigation into the accuracy of that information. *See Cushman*, 115 F.3d at 225 (holding that "absent any indication that the information is inaccurate, the statute does not mandate [an investigation beyond the original source of information]"). The FTC has published agency guidance to the same effect. *See* FTC Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600 app. (concluding that § 1681e(b) does "not hold a consumer reporting agency responsible where an item of information that it receives from a source that it

reasonably believes to be reputable appears credible on its face, and is transcribed, stored and communicated as provided by that source").  Plaintiff has pointed to no evidence that Trans Union acted in willful noncompliance in interpreting the FCRA and in adopting procedures pursuant to the FCRA.  Therefore, I will grant Trans Union's motion for summary judgment on the issue of willful noncompliance with the FCRA.

V.       **Claims Against Richard & Associates**

Against Richard & Associates, plaintiff brings claims for violations of the FDCPA and conversion.  Richard & Associates's motion for summary judgment as to these claims will be granted in part and denied in part.

A.       **Count III:  Violation of the FDCPA**

Plaintiff asserts that Richard & Associates violated the FDCPA by "repossessing plaintiff's vehicle when it had no present right to do so."  (Compl. ¶ 70.)  Richard & Associates argues that, as an agent of AHFC, it had "both a contractual and legal right to take possession of the Vehicle once the Buckingham Township police seized the Vehicle, as such seizure constituted a default under the Contract."  (Richard & Associates's Mem. 5.)  Because whether Richard & Associates had a right pursuant to the FDCPA to possess plaintiff's vehicle turns on an ambiguous provision of the Contract, I will deny Richard & Associates's motion for summary judgment as to this claim.

The FDCPA provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  The statute further provides that a

debt collector violates § 1692f when it "tak[es] . . . any nonjudicial action to effect dispossession or disablement of property if . . . there is no present right to possession of the property claimed as collateral through an enforceable security interest." *Id.* § 1692f(6). A "debt collector" is defined by the FDCPA as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). For purposes of § 1692f(6), the term also includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." *Id.*

Plaintiff asserts that Richard & Associates is a "debt collector" under the FDCPA (Compl. ¶ 68), and Richard & Associates does not contest this designation. Whether AHFC—and by virtue of its relationship with AHFC, Richard & Associates—had a present right to possess the car depends on whether plaintiff had, in fact, defaulted under the Contract. This question, as explained above, turns on whether plaintiff had exposed the car to seizure. As the meaning of "expose" is a question for the jury, *see supra* Part III.A, this claim is not appropriately decided on summary judgment. Richard & Associates's motion for summary judgment on this claim will be denied.

**B.     Count VI:  Conversion**

Plaintiff's conversion claim includes not only defendant AHFC, but also defendant Richard & Associates. Richard & Associates, like AHFC, argues that plaintiff's claim for conversion of the car is barred by the gist of the action doctrine. With respect to Richard &

37

Associates, too, I will grant the motion for summary judgment as to this claim.

Plaintiff and Richard & Associates do not have a contractual relationship; plaintiff has not brought a breach of contract claim against Richard & Associates.  Nevertheless, Richard & Associates was acting as the agent of AHFC when it repossessed the car.  The gist of the action doctrine may bar tort claims brought against an agent of the entity with which the plaintiff has a contractual relationship.  In *eToll, Inc.*, the Pennsylvania Superior Court addressed claims for, inter alia, breach of contract against the corporate defendant and fraud against the corporate defendant and three of its agents.  811 A.2d at 12.  The appellate court affirmed the trial court's grant of summary judgment based on the gist of the action doctrine in favor of all the defendants on all the fraud claims—i.e., on the fraud claims not only as to the corporation, but also as to its agents.  *Id.* at 21.  Even the fraud claims relating to the agents were "inextricably intertwined with the contract claims."  *Id.*  Likewise, for the reasons explained above with respect to AHFC, the instant conversion claims are inextricably intertwined with plaintiff's breach of contract claim.  Thus, plaintiff's conversion claim against AHFC's agent, Richard & Associates, is barred by the gist of the action doctrine.  Richard & Associates's motion for summary judgment on this claim will be granted.

## VI.    Conclusion

I will grant defendants' motions for summary judgment in part and deny them in part. Because the term "expose" in the Contract is ambiguous, its meaning is a question for the jury. The liability determinations in Count III (alleging violation of the FDCPA by Richard & Associates), in Count IV (alleging violation of Pennsylvania's UCC by AHFC), in Count V

(alleging breach of contract and wrongful repossession by AHFC), in plaintiff's first three requests for declaratory relief in Count VII, and in AHFC's counterclaim for breach of contract revolve around the meaning of this ambiguous term.  Therefore, I will deny summary judgment as to those claims.

With respect to the FCRA claims arising out of plaintiff's October 2006 notice of dispute (contained in Counts I and II), I will grant AHFC's motion for summary judgment and will deny Trans Union's motion for summary judgment.  With respect to the FCRA claims arising out of plaintiff's January 2007 notice of dispute (also contained in Counts I and II), I will deny both AHFC's and Trans Union's motions.  I will grant Trans Union's motion for summary judgment as to plaintiff's prayer for punitive damages in Count II, and I will deny AHFC's motion for summary judgment on plaintiff's fourth request for declaratory relief in Count VII.

Finally, I will grant AHFC's and Richard & Associates' motions for summary judgment on plaintiff's conversion claims in Count VI because those claims are barred by the gist of the action doctrine.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSEMARY KRAJEWSKI,           :
    Plaintiff,              :
                            :     CIVIL ACTION
    v.                      :
                            :     NO. 07-1793
AMERICAN HONDA FINANCE CORP. et al.,   :
    Defendants.             :
                            :

## Order

YOHN, J.

AND NOW, this _____ day of May 2008, upon consideration of defendants' summary judgment motions (Doc. Nos. 29, 31, and 32), plaintiff's responses thereto, and defendants' replies, IT IS HEREBY ORDERED that

1. The motion of defendant American Honda Finance Corp. ("AHFC") for summary judgment as to Count I is GRANTED with respect to the reasonableness of AHFC's investigation in response to plaintiff's October 2006 notice of dispute.  Judgment is entered in favor of AHFC and against Rosemary Krajewski with respect to the reasonableness of AHFC's investigation in response to plaintiff's October 2006 notice of dispute.  The motion of defendant AHFC for summary judgment as to Count I is DENIED with respect to AHFC's investigation in response to plaintiff's January 2007 notice of dispute.

2. The motion of defendant AHFC for summary judgment as to Counts IV, V, and VII is DENIED.

3. The motion of defendant AHFC for summary judgment as to Count VI is GRANTED.

Judgment is entered in favor of AHFC and against Rosemary Krajewski on Count VI.

4.      The motion of defendant Trans Union Corp. for summary judgment as to Count II is

DENIED with respect to plaintiff's claim regarding Trans Union's failure to follow

reasonable procedures pursuant to 15 U.S.C. § 1681e(b) and failure to conduct a

reasonable reinvestigation pursuant to 15 U.S.C. § 1681i(a).  The motion of defendant

Trans Union for summary judgment as to Count II is GRANTED with respect to

plaintiff's claims for punitive damages.  Judgment is entered in favor of Trans Union and

against Rosemary Krajewski with respect to Count II's prayer for punitive damages.

5.      The motion of defendant Richard & Associates for summary judgment as to Count III is

DENIED.

6.      The motion of defendant Richard & Associates for summary judgment as to Count VI is

GRANTED.  Judgment is entered in favor of Richard & Associates and against Rosemary

Krajewski on Count VI.

7.      The motion of defendant AHFC for summary judgment on its breach of contract

counterclaim is DENIED.


                                                    s/ William H. Yohn Jr.
                                                    William H. Yohn Jr., Judge